Freddie L. CARTER, Appellant,

v.

B & B CONSTRUCTION, INC., and
Providence Washington Insurance
Company, Appellees.

No. S–12295.

Supreme Court of Alaska.

Dec. 19, 2008.

Michael A. Stepovich, Fairbanks, and Allen F. Vacura, Fairbanks, for Appellant.

Constance Cates Ringstad, McConahy, Zimmerman & Wallace, Fairbanks, for Appellees.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION ON REHEARING*

EASTAUGH, Justice.

## I. INTRODUCTION

Freddie Carter was injured on the job in 1992. Since then he has suffered from a series of health problems and is currently unable to work. He appeals the Alaska Workers' Compensation Board's denial of his request for Permanent Total Disability (PTD) benefits and its refusal to grant him additional reemployment benefits. He also appeals the superior court's denial of his claim for additional interest, attorney's fees, and costs. Because substantial evidence did not support the board's decision that Carter is not entitled to PTD benefits and because Carter is entitled to additional interest on his reemployment benefits, we reverse and remand.

## II. FACTS AND PROCEEDINGS

In August 1992 Freddie Carter suffered two injuries to his neck and left shoulder while performing heavy lifting for his employer, B & B Construction, Inc. After the second injury Carter filled out an occupational injury report and in September B & B began paying Carter Temporary Total Disability (TTD) benefits.

Carter was first treated for his neck injuries by Dr. Robert Dingeman, who requested an MRI of Carter's cervical spine. The MRI showed large herniated disks at the C5–6 and C6–7 levels and slight disk bulging and posterior osteophytosis at the C3–4 level. Dr. Dingeman referred Carter for an evalua-

tion and probable surgery with Dr. John Joosse.

In October Dr. Joosse operated on Carter to fuse his neck vertebrae. Eleven days after the surgery Dr. Joosse reported that Carter was doing well and that he "could do desk light duty work." In December Dr. Joosse reported that "[t]he C5–6 level appears solidly fused. The C6–7 is a little bit delayed in its solid fusion. There is no evidence, however, for graft collapse, and clinically everything looks good." Dr. Joosse stated that by the end of the month Carter would probably be able to return to work, starting "at medium duty and progressing as he improves." Dr. Joosse also noted that Carter said he was having ulcer symptoms.

In January 1993 Carter injured his lower back while shoveling snow. Dr. Joosse diagnosed this injury as an "acute lumbar strain" that he doubted was related to Carter's previous work-related injury. B & B controverted both Carter's claim regarding his lower back condition and his continued receipt of TTD benefits from his 1992 injury.

On April 2, 1993 Dr. Joosse concluded that Carter's condition was stable and that he would be able to work except for his lower back pain. Dr. Joosse later gave Carter's cervical condition a Permanent Partial Impairment (PPI) rating of ten percent, whole person impairment.

On April 27, 1993 Carter requested a reemployment benefits eligibility evaluation. Because he made his request more than ninety days after he gave B & B notice of his injuries, he indicated that he would later submit a written statement that explained the unusual and extenuating circumstances that prevented him from filing in a timely manner. On May 4, 1993 (one week after Carter's request) the Alaska Division of Workers' Compensation informed Carter that it could not act on Carter's request until Carter submitted his written statement of unusual and extenuating circumstances. The division also stated that it could not act on Carter's request because it believed, mistakenly, that Carter had been released to return to work.

In June 1993 Carter filed an application for adjustment of claim with the Alaska Workers' Compensation Board, requesting relief that included (1) TTD benefits from February 15, 1993 to the then-present date; (2) PPI benefits; (3) medical costs relating to his January 1993 injury to his lower back; and (4) review of what he referred to as the division's "decision" regarding his eligibility evaluation request.

Later that month Dr. Edwin Lindig, Carter's new treating physician, reported that Carter's symptoms were essentially unchanged and that his neck problem was his "main disabling factor." Between June 1993 and February 1994 Dr. Lindig consistently reported that Carter had not been released for work and needed vocational rehabilitation.

In April 1994 Dr. James Foelsch performed a follow-up neurological evaluation of Carter. Dr. Foelsch diagnosed Carter with chronic neck pain "without evidence of radiculopathy [1] or myelopathy." [2] Dr. Foelsch also diagnosed Carter with probable peripheral neuropathy [3] but suggested that this was related to Carter's alcohol intake instead of his neck or lower back pain.

On September 9, 1994 the board ruled that (1) Carter was not entitled to TTD benefits beyond April 2, 1993, when Dr. Joosse reported that Carter's cervical condition had stabilized; (2) Carter was entitled to PPI benefits according to his ten-percent PPI rating; and (3) Carter's lower back condition was non-work-related and thus non-compensable. The board also stated that the division properly "concluded [that Carter] waited too long to request reemployment benefits and denied [him] eligibility" because he failed to provide unusual and extenuating circum-

---

1. Radiculopathy is a "disease of the nerve roots." Dorland's Illustrated Medical Dictionary 1404 (28th ed.1994).

2. Myelopathy is "a general term denoting functional disturbances and/or pathological changes in the spinal cord." *Id.* at 1090.

3. Neuropathy is "a functional disturbance or pathological change in the peripheral nervous system, sometimes limited to noninflammatory lesions as opposed to those of neuritis; the etiology may be known or unknown." *Id.* at 1132.

stances to justify his untimely request. On October 6, 1994 Carter sent the division a written explanation of unusual and extenuating circumstances.

In September 1995 Carter petitioned the board for rehearing and modification of the board's September 9, 1994 ruling on his eligibility evaluation request because, he asserted, that ruling was based on a mistake of fact. Carter specifically argued that the board mistakenly characterized the division's May 4, 1993 letter to Carter as a conclusive denial of his eligibility evaluation request. After the board denied his petition for rehearing Carter appealed to the superior court. On March 13, 1998 the superior court found that the division's May 4, 1993 letter was not a final decision and reversed and remanded to the board for reconsideration of Carter's eligibility evaluation request.

In August 1999 the division, after receiving Carter's case on remand from the board, decided that Carter was entitled to an eligibility evaluation because he had sufficiently demonstrated unusual and extenuating circumstances that prevented him from requesting his evaluation on time. After B & B unsuccessfully appealed this decision to both the board and the superior court, Carter asked the division to assign him a rehabilitation specialist to perform his eligibility

evaluation. On December 27, 2001 the division assigned Carter a rehabilitation specialist and on April 2, 2002 it found Carter to be eligible for reemployment benefits.

In the interim period between Carter's 1995 petition for rehearing and the April 2002 determination that he was eligible for reemployment benefits, Carter experienced significant medical difficulties. In January 1996 he suffered a seizure and was admitted to the hospital, where he suffered a second seizure. In December 1996 he was admitted to the intensive care unit of the hospital because of an onset of type I diabetes. Then in April 1998 he was again hospitalized, this time because of dyspnea[4] complaints. Carter was treated by Dr. Kendrick Blais, who diagnosed him at discharge with (1) pulmonary emboli,[5] (2) deep vein thrombosis in his right calf,[6] (3) diabetes, (4) hypercholesterolemia,[7] (5) status post anterior fusion C5–C6 and C6–C7, (6) generalized tonic-clonic seizures, and (7) chronic gastritis.[8]

On October 25, 1999 Carter experienced a syncopal episode[9] at his home and was taken to the emergency room. When he was discharged eight days later he was diagnosed with (1) pulmonary embolus; (2) deep vein thrombosis; (3) Barrett's esophagus,[10] including Schatzki ring,[11] pyloric gastritis, and duodenal polyps;[12] (4) anemia,[13] iron defi-

**4.** Dyspnea is "difficult or labored breathing." *Id.* at 518.

**5.** A pulmonary embolus is "a mass of clotted blood or other formed elements" "brought by the blood from another vessel and forced into a smaller one [of the lung], thus obstructing the circulation." *Id.* at 542, 1386.

**6.** Thrombosis is "the formation, development, or presence of ... an aggregation of blood factors, primarily platelets and fibrin with entrapment of cellular elements, frequently causing vascular obstruction at the point of its formation." *Id.* at 1707–08.

**7.** Hypercholesterolemia is an "excess of cholesterol in the blood ." Dorland's Illustrated Medical Dictionary 792 (28th ed.1994).

**8.** Gastritis is an "inflammation of the stomach." *Id.* at 680.

**9.** A syncopal episode is an episode "pertaining to or characterized by ... a temporary suspension of consciousness due to generalized cerebral ischemia; a faint or swoon." *Id.* at 1622.

**10.** Barrett's esophagus is a "peptic ulcer of the lower esophagus, often with stricture, due to the presence of columnar-lined epithelium." *Id.* at 1625. Dr. Blais testified that Barrett's esophagus "refers to a chronic inflammation of the lower end of the esophagus where acid has chronically been affecting an area that's not really supposed to have acid to it."

**11.** Schatzki ring, also called esophageal ring, is "an annular constriction of the lower esophagus, usually at the junction of the esophageal and gastric mucosa." *Id.* at 1467.

**12.** A duodenal polyp is "a morbid excrescence, or protruding growth, from [the] mucous membrane" "of, pertaining to, or situated in, the ... first or proximal portion of the small intestine, extending from the pylorus to the jejunum." *Id.* at 511, 1330.

**13.** Anemia is "a reduction below normal in the number of erythrocytes per cu. mm., in the quantity of hemoglobin, or in the volume of packed red cells per 100 ml. of blood which occurs when the equilibrium between blood loss (through

ciency;[14] (5) type II diabetes; (6) essential benign hypertension;[15] (7) seizure disorder; (8) hyperlipidemia/hypertriglyceridemia;[16] (9) chronic pain related to degenerative joint disease of the cervical spine; and (10) chronic low back pain with left radiculopathy.

In January 2000 Dr. Blais wrote in an "Application for Medical Cancellation of Student Loan Debt" form for Carter that "[c]hronic pain prevents constant employment. Multiple medical problems. Pulmonary embolus has caused permanent respiratory injury." Dr. Blais also stated that Carter was permanently disabled with a rating of "50% or more." At around the same time, Dr. Foelsch filled out an identical form, but he diagnosed only Carter's neck pain, left-sided numbness, and cervical spondylosis[17] and stated that Carter was totally and permanently disabled. Dr. Foelsch explained that Carter was prevented from resuming employment or vocational rehabilitation because his "neck pain interferes with all activities of daily living and is progressive."

In October 2000 Carter was admitted to the hospital with symptoms of acute pancreatitis. His condition progressed into a life-threatening illness when his bowels completely stopped functioning. Dr. Blais testified that Carter required "a rather massive surgery opening up his entire abdomen and a very extended treatment in Intensive Care Unit." Carter was not discharged from the hospital until February 2001, when he was admitted to a skilled nursing facility. In March 2001 his surgeon, Dr. William Montano, reported that because of Carter's serious condition there was "no doubt that Mr. Carter would be unable to do any sort of work" at that point, and that Carter was "not likely to be able to do any sort of work or to participate in retraining for at least [one] year from the onset of his disability in October 2000."

As mentioned above, Carter was found eligible for reemployment benefits in April 2002. But by August 2002 Kaya Kade, the rehabilitation specialist assigned to Carter's claim, had concluded that no occupational goals or training could be selected for Carter because of his diminished physical capabilities. Based on Kade's conclusion, the division determined that Carter could not meet the requirements of AS 23.30.041(h) and (i) and therefore denied Carter's reemployment plan.

In December 2002 Carter filed with the board a claim for (1) reemployment benefits from July 14, 1994 to January 30, 1999;[18] (2) PTD benefits beginning on approximately January 3, 1999 "and possibly earlier"; (3) medical costs; (4) penalty; (5) interest; (6) unfair or frivolous controversion; and (7) attorney's fees and costs. In October 2003 the board ruled that Carter was entitled to two years of reemployment benefits under AS 23.30.041(k), but it denied Carter's claim for PTD benefits. The board also granted Car-

---

bleeding or destruction) and blood production is disturbed." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 72 (28th ed.1994).

**14.** Iron deficiency is "anemia characterized by low or absent iron stores, low serum iron concentration, elevated free erythrocyte porphyrin, low transferrin saturation, elevated transferrin, low serum ferritin, low hemoglobin concentration or hematocrit, and hypochromic microcytic red blood cells." *Id.* at 73.

**15.** Essential hypertension is "high arterial blood pressure ... occurring without discoverable organic cause." *Id.* at 801.

**16.** Hyperlipidemia is "a general term for elevated concentrations of any or all of the lipids in the plasma, including hypertriglyceridemia, hypercholesterolemia, etc." *Id.* at 795. Hypertriglyceridemia is "an excess of triglycerides in the

blood." *Id.* at 802. Dr. Blais testified that the term "hyperlipidemia/hypertriglyceridemia" as used in Carter's discharge report refers to "fats in the blood including cholesterol" that were linked to Carter's diabetes and that led to "an extreme life-threatening illness in October, 2000 ... when [Carter] was hospitalized for an extensive period of time."

**17.** Cervical spondylosis is a "degenerative joint disease affecting the cervical vertebrae, intervertebral disks, and surrounding ligaments and connective tissue, sometimes with pain or paresthesia radiating down the arms as a result of pressure on the nerve roots." *Id.* at 1564.

**18.** Carter originally requested reemployment benefits beginning on April 3, 1993, but he modified his claim at the board hearing to a request for such benefits from July 14, 1994 to January 30, 1999.

ter attorney's fees and costs relating to his subsection .041(k) claim.

Carter appealed to the superior court. On March 22, 2006 it affirmed the board's grant of reemployment benefits and its denial of PTD benefits. The superior court also awarded Carter interest on his subsection .041(k) benefits and $1,000 in attorney's fees and costs. Carter appeals.

## III. DISCUSSION

### A. Standard of Review

■ Carter argues that he is entitled to PTD benefits, more than two years of subsection .041(k) benefits, additional interest on his subsection .041(k) benefits, and additional attorney's fees. The superior court acted as an intermediate court of appeal when it reviewed the board's December 9, 2003 decision and order. When the superior court acts as an intermediate court of appeal in an administrative matter, we independently review the merits of the administrative agency's decision.[19]

■ In deciding questions of law involving agency expertise, we apply the rational basis standard and defer to the agency's determination so long as it is reasonable.[20] In deciding questions of law that do not involve agency expertise "or where the agency's specialized knowledge and experience would not be particularly probative as to the meaning of the statute" we substitute our own judgment for that of the agency.[21] We will "adopt the rule of law that is most persuasive in light of precedent, reason, and policy." [22]

■ We review the board's factual findings under the substantial evidence stan-

dard.[23] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [24] We reverse board decisions when we "cannot conscientiously find that the evidence supporting that decision is substantial." [25]

### B. Carter Is Entitled to PTD Benefits.

■ Alaska Statute 23.30.120(a)(1) states that, in the absence of substantial evidence to the contrary, claims under the Alaska Workers' Compensation Act are presumed to be compensable.[26] We have established the following three-step analysis:

> First, the employee must establish a preliminary link between the [disability] and the employment. This step of the analysis requires consideration of "only evidence that tends to establish the link."
>
> . . . .
>
> [Second, the court inquires] whether the employer rebutted this presumption with "substantial evidence that either (1) provides an alternative explanation which, if accepted, would exclude work related factors as a substantial cause of the [disability]; or (2) directly eliminates any reasonable possibility that employment was a factor in causing the disability."
>
> . . . .
>
> [Third], once the employer has rebutted the presumption that the injuries are work related, the employee can prevail only if he proves his claim by a preponderance of the evidence.[27]

In its October 2003 decision and order the board employed this three-step analysis and ruled that Carter was not entitled to PTD

**19.** *Williams v. Abood,* 53 P.3d 134, 139 (Alaska 2002).

**20.** *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987).

**21.** *Id.*

**22.** *Williams,* 53 P.3d at 139.

**23.** *Id.*

**24.** *Leigh v. Seekins Ford,* 136 P.3d 214, 216 (Alaska 2006).

**25.** *Robinson v. Municipality of Anchorage,* 69 P.3d 489, 493 (Alaska 2003) (quoting *Bouse v. Fireman's Fund Ins. Co.,* 932 P.2d 222, 231 (Alaska 1997)).

**26.** *See also Leigh,* 136 P.3d at 216.

**27.** *Robinson,* 69 P.3d at 494 (quoting *Temple v. Denali Princess Lodge,* 21 P.3d 813, 816 (Alaska 2001)).

benefits. Under step three, the board stated that

> After reviewing the record as a whole, we find that the employee cannot prove his claim by a preponderance of the evidence. The evidence shows that the employee was injured in 1992 while at work. He hurt his neck and shoulder, and achieved medical stability as of April 1993, according to our previous decision in this case. The employee suffered serious non-work-related medical problems, which made him permanently and totally disabled, probably since 1998 according to his treating physician at the time. His current treating physician testified that these serious and more recent problems are not substantially related to the 1992 injury, and that, but for these newer problems, the employee could be retrained. Consequently, we conclude his claim for PTD benefits must be denied.

Carter contends that he was entitled to PTD benefits as of January 31, 1999. He argues that B & B has not rebutted the compensability presumption. Alternatively, he argues that even if B & B rebutted the presumption, substantial evidence does not support the board's finding that he failed to prove his claim by a preponderance of the evidence. B & B counters that substantial evidence supports the board's finding that "Carter's serious non-work[-]related medical conditions, and not his work injury, caused Carter's PTD," and that such evidence both rebutted the compensability presumption and prevented Carter from proving his claim by a preponderance of the evidence.

■ At step two of the analysis the board must determine whether the employer has rebutted the presumption of compensability with "substantial evidence that either (1) provides an alternative explanation which, if accepted, would exclude work related factors as a substantial cause of the [disability]; or (2) directly eliminates any reasonable possibility that employment was a factor in causing the

disability." [28] "Substantial evidence" is evidence that a reasonable mind might accept as adequate to support a conclusion. [29] "Whether the amount of evidence was substantial is a legal question, subject to independent review by the court." [30]

The board does not weigh the evidence at step two. [31] But if the only medical evidence offered by the employer at step two is uncontroverted, yet inconclusive, the presumption of compensability is not overcome. [32]

The board relied exclusively on the uncontroverted testimony of Dr. Blais, Carter's treating physician, when it concluded at step two that B & B had rebutted the presumption of compensability. Thus, the board's decision and order states:

> In order to rebut the presumption that the employee is entitled to PTD benefits, the employer relies on Dr. Blais' hearing testimony that none of the current health problems from which the employee suffers since 1999, and which make him unemployable are substantially related to or caused by the 1992 work-related injury. The employer also relies on Dr. Blais testimony that the employee would be able to be retrained for gainful employment, but for these non work-related diagnoses. *Based on this evidence, we find that the employer has rebutted the presumption that the employee is entitled to PTD benefits.* Once the presumption drops out we must determine whether the employee can prove his claim for PTD benefits by a preponderance of the evidence.

(Emphasis added.)

Parts of Dr. Blais's testimony directly supported Carter's argument that his work-related injures *were* a substantial factor in his PTD. Thus, on direct examination by Carter's lawyer, Dr. Blais offered this testimony:

> Q: In terms of the work [injuries] being a part, a component of [Carter's] overall permanent total disability, would you

**28.** *Lindhag v. State, Dep't of Natural Res.*, 123 P.3d 948, 953 (Alaska 2005).

**29.** *Norcon, Inc. v. Alaska Workers' Comp. Bd.*, 880 P.2d 1051, 1054 (Alaska 1994).

**30.** *Bouse*, 932 P.2d at 235.

**31.** *Id.* (citing *Norcon*, 880 P.2d at 1054).

**32.** *Id.* (citing *Grainger v. Alaska Workers' Comp. Bd.*, 805 P.2d 976, 979 (Alaska 1991)).

say that the cervical injury is a substantial factor in the permanent total disability?

A: Yes, substantial factor would be an appropriate choice of words.

Q: And would you say also that the work injury is a substantial factor in that it is combined with these other maladies, these other conditions, that we've discussed to render Mr. Carter permanently totally disabled?

A: Yes.

. . . .

Q: And your opinions today, Doctor, are given to a reasonable degree of medical certainty, is that correct?

A: Yes, it is.

This testimony directly supported Carter's PTD claim.

As we saw above, the board relied on other passages in Dr. Blais's testimony when it ruled that B & B had rebutted the presumption of compensability. On appeal B & B argues that Dr. Blais's testimony established that the 1992 work-related injury did not cause the serious health problems that now render Carter unemployable, and that Carter would be employable if he did not have these major health problems. In the passages discussed by B & B, Dr. Blais testified that if Carter only had his work-related injuries it was "conceivable he could do some very light types of [work] activities" and that in such a situation there was "a reasonable chance [Carter] could work an eight-hour day, with breaks." He also testified, in response to questions of a board member, that, "with one qualification," Carter's current problems with esophagitis, diabetes, hypertension, recurrent pulmonary embolus, deep vein thrombosis, seizure disorder, and hyperlipidemia were not related to the neck injury or the pain medication for that injury.[33] This testimony is consistent with Dr. Blais's responses to a June 2002 letter from Northern Rehabilitation Services. In that letter Northern Reha-

bilitation Services asked Dr. Blais whether, in relation to Carter's 1992 injury and cervical fusion only, Carter was competitively employable in the labor market on a full-time basis. Dr. Blais responded, "Yes" and added that his response related to Carter's "anterior cervical fusion only." Dr. Blais also stated in his response to that letter that Carter's 1992 injury and cervical fusion were medically stable and that, in relation to those two factors only, Carter could be immediately targeted for sedentary and light work.

■ For purposes of the step-two analysis, the evidence relied on by B & B must be read in light of Dr. Blais's opinion, discussed and quoted above, that the work injury was "a substantial factor" in rendering Carter permanently and totally disabled. It must also be read in context of his testimony that Northern Rehabilitation Services's written questions were "very hypothetical, somewhat fictitious," and "bogus." Thus, even though some passages in Dr. Blais's testimony and his responses to Northern Rehabilitation Services's letter support a conclusion that Carter's non-work-related health conditions are a substantial factor in his PTD, they do not rule out his work injury as *another* substantial factor. There can be more than one substantial factor in a disability. Therefore, to rebut the presumption of compensability at step two, the employer must offer evidence that either excludes work-related factors as "a substantial cause" of the disability, or directly eliminates any reasonable possibility employment was "a factor" in causing the disability.[34]

Because Dr. Blais's "substantial factor" testimony directly supporting Carter's claim was uncontroverted by any other witness, and because the passages in Dr. Blais's testimony relied on by the employer and the board at step two failed to establish that the work injury was not "a substantial factor" in bringing about Carter's permanent total disability, the evidence must be regarded as insufficient to rebut the presumption of com-

---

**33.** The "one qualification" noted by Dr. Blais was that the legal issues related to the workers' compensation claim "in a sense" affected Carter's stressors and blood sugar and therefore affected his diabetes.

**34.** *Robinson v. Municipality of Anchorage,* 69 P.3d 489, 494 (Alaska 2003) (quoting *Temple v. Denali Princess Lodge,* 21 P.3d 813, 816 (Alaska 2001)).

pensability.[35] Because substantial evidence does not support the board's decision that B & B rebutted the compensability presumption, we reverse and hold that Carter is entitled to PTD benefits as a matter of law.

## C. Carter Is Entitled to Two Years of Reemployment Benefits.

■ Before it was amended in 2005, AS 23.30.041(k) stated that

If the employee's permanent impairment benefits are exhausted before the completion or termination of the reemployment plan, the employer shall provide compensation equal to 70 percent of the employee's spendable weekly wages, but not to exceed 105 percent of the average weekly wage, until the completion or termination of the plan.... [36]

Carter asked the board to award subsection .041(k) benefits from July 14, 1994 to January 30, 1999. In its October 9, 2003 decision the board relied on *Townsend v. United Parcel Service*[37] and *Tindera v. Qwick Construction Co.*,[38] to conclude that an employee may be eligible for subsection .041(k) benefits prior to approval or acceptance of a reemployment plan so long as he has begun the reemployment process. Because the board found that B & B "submitted no evidence to contradict the efficacy of a reemployment plan within two years after [Carter's] initial request for [an eligibility evaluation]," it granted him reemployment benefits "for the statutorily allowed maximum period of two years." Thus, the board implicitly held that Carter had begun the reemployment process when he initially applied for an eligibility evaluation. The board also implicitly rejected Carter's argument that subsection .041(k) benefits are not capped at two years. On October

29, 2003 B & B paid Carter two years of reemployment benefits.

Carter then appealed the board's October 9 ruling to the superior court, arguing that the board "erred in only awarding two years of .041(k) benefits." In considering Carter's appeal, the superior court read this court's opinion in *Raris v. Greek Corner*[39] to mean that an "employee must be developing or executing a reemployment plan to be eligible for benefits." Moreover, the superior court held that Carter began developing or executing a reemployment plan when he was assigned a rehabilitation specialist to conduct his eligibility evaluation. The superior court held that Carter was entitled to subsection .041(k) benefits only from December 27, 2001 (when he was assigned a rehabilitation specialist) until August 9, 2002 (when his rehabilitation specialist reported that no reemployment plan could be formulated for him).[40]

On appeal, Carter argues that the superior court erred because he is entitled to more than four years of reemployment benefits, from July 14, 1994 (when his PPI lump sump payment was exhausted) to January 31, 1999 (when he became permanently totally disabled). B & B counters that Carter is not entitled to more than two years of reemployment benefits because AS 23.30.041(k) has a strict two-year time limit on benefit awards. It also argues that Carter is merely trying to use subsection .041(k) benefits as an income-replacement vehicle "without any relationship to any plan's approval, acceptance, completion or termination or to Carter's participation in any plan."

Because the superior court acted as an intermediate court of appeal, we will independently review the merits of the board's decision.[41] Carter's request for additional

---

**35.** *Grainger,* 805 P.2d at 979.

**36.** Former AS 23.30.041. In 2005 the phrase "reemployment plan" was replaced with "reemployment process." Ch. 10, § 20, FSSLA 2005.

**37.** *Townsend v. United Parcel Serv.,* AWCB Decision No. 91–0216 (August 3, 1991).

**38.** *Tindera v. Qwick Constr. Co.,* AWCB Decision No. 90–0056 (March 27, 1990).

**39.** *Raris v. Greek Corner,* 911 P.2d 510, 512–13 (Alaska 1996).

**40.** Despite this holding the superior court ruled that Carter could keep the two years of subsection .041(k) benefits that B & B had already paid him because B & B conceded at oral argument below that Carter could keep those benefits "in the interest of closing the case, . :. irrespective of proof as to whether his hypothetical reemployment training would have taken two years."

**41.** *Rockney v. Boslough Constr. Co.,* 115 P.3d 1240, 1241–42 (Alaska 2005) (independently reviewing board's approval of appellant's reemployment plan).

reemployment benefits turns on whether an employee may be entitled to subsection .041(k) benefits before his reemployment plan is approved or accepted and, if so, when that entitlement begins. These are questions of law that do not involve the board's expertise; we will therefore substitute our own judgment for that of the board.[42] We will "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[43]

■ We note initially that B & B is correct that AS 23.30.041(k) contains a two-year cap on benefits after a reemployment plan is accepted or approved. In *Binder v. Fairbanks Historical Preservation Foundation*, the claimant sought benefits for a period exceeding two years.[44] We rejected that contention, reasoning that the language of subsection .041(k) unambiguously states that "an employer's total exposure for any number of reemployment plans an employee pursues must be capped at ... two years in time."[45] In so holding, we noted that the legislative history of the Act indicates that the two-year reemployment benefits cap "was intended to return injured workers to the work force as expeditiously as possible."[46]

■ With respect to Carter's argument that he became entitled to subsection .041(k) benefits before his reemployment plan was approved, we agree with the board's ruling that an employee may be eligible for subsection .041(k) benefits before approval or acceptance of a reemployment plan so long as he has begun the reemployment process. The board has explained that it has "consistently held that when PPI benefits are exhausted, [subsection .041(k) ] stipend benefits are to be provided during the reemployment process, not just during the course of a reemployment plan."[47] This practice is in accord with *Raris*, in which we observed that reemployment benefits "are paid contingent on the employee's participation in the development and execution of a reemployment plan."[48] In other words, employees become eligible for reemployment benefits when they begin participating in the reemployment process.[49]

The more difficult question is this: When does an employee begin participating in the reemployment process? The answer to this

**42.** *Arnesen v. Anchorage Refuse, Inc.*, 925 P.2d 661, 664 (Alaska 1996) ("The interpretation of AS 23.30.041 ... is a question of law suitable to judicial determination de novo.").

**43.** *Williams v. Abood*, 53 P.3d 134, 139 (Alaska 2002).

**44.** *Binder v. Fairbanks Historical Pres. Found.*, 880 P.2d 117, 121 (Alaska 1994).

**45.** *Id.* at 122.

**46.** *Id.*

**47.** *Wagner v. Furniture Enters. of Alaska, Inc.*, AWCB Decision No. 04–0253 (October 26, 2004) (citing *Townsend v. United Parcel Serv.*, AWCB Decision No. 91–0216 (August 3, 1991) (holding that "it is not necessary for an employee to commence a plan before benefits can be awarded under AS 23.30.041(k)")).

**48.** *Raris*, 911 P.2d at 512–13.

**49.** The legislature adopted this view in 2005 when it amended AS 23.30.041(k) by replacing the phrase "reemployment plan" with "reemployment process" in several places. The legislative history shows that this change was made to ratify the way in which the board was applying AS 23.30.041(k). On April 5, 2005 Paul Lisankie, Director of the Workers' Compensation Division, testified before the Senate Judiciary Committee that:

> Over the years, because of the nature of the system, the workers' compensation board has interpreted the current version of [subsection] .041(k) to permit the payment of [subsection .041(k) ] benefits to people who are not yet in a retraining plan, even though the current statute refers to "if certain things happen before the completion of a plan." So they are essentially saying, currently, we are treating it as if you were in this process you can qualify for these time loss benefits. The ad hoc committee has proposed that we make explicit what we're already doing by changing to the word "process." So when you see the word "process" in place of the word "plan," that was designed to simply, essentially ratify what's already being done, and make the verbiage of [subsection] .041(k) consistent with what's being done. So it's kind of a broadening of the benefit, as far as the literal version, literal verbiage, but reflective of what's actually been happening for years, as the board interpreted this section.

Minutes, S. Judiciary Comm. on S.B. 130, Apr. 5, 2005, testimony of Paul Lisankie, Director, Dep't of Labor & Workforce Dev., Div. of Workers' Comp. (9:50–9:52).

question potentially determines whether there was a delay in providing benefits, and thus whether and when interest began accruing on the benefits. The superior court concluded that Carter began participating in the reemployment process when he was assigned a rehabilitation specialist to perform his eligibility evaluation. Although this is not an implausible reading of AS 23.30.041(k), we conclude that it is incorrect.

When an employee exhausts PPI benefits before completion or termination of the reemployment process, AS 23.30.041(k) "provides a fall-back source of income." [50] Given this purpose, we think that the legislature did not intend that there should be a gap between the expiration of PPI benefits and the commencement of reemployment benefits for employees who are vigorously pursuing eligibility evaluations before their PPI benefits expire.[51] We therefore conclude that the reemployment process begins when the employee begins his active pursuit of reemployment benefits.

Because Carter began to actively pursue reemployment benefits on April 27, 1993 when he requested an eligibility evaluation, and because he continued to actively pursue those benefits by petitioning the board for review of the division's May 4, 1993 "decision," by petitioning the board for a rehearing, and by appealing to the superior court, we conclude that the board did not err in awarding him reemployment benefits, beginning when his PPI payment was exhausted on July 14, 1994, for the statutory maximum period that a reemployment plan can last— two years. We do not decide whether subsection .041(k) benefits may be payable for more than two years if they start before acceptance or approval of a reemployment plan. That issue has not been briefed or argued here. Carter has not convinced us that the board erred under the circumstances of this case in awarding him subsection .041(k) benefits for only two years.

### D. Carter Is Entitled to Additional Interest on His Reemployment Benefits.

Carter argues that he should have been awarded additional interest on his reemployment benefits. Having concluded that Carter was entitled to reemployment benefits from December 27, 2001 to August 9, 2002, the superior court calculated the interest payable to Carter on the benefits Carter would have accrued during that period. Interest on the first payment due therefore began running December 27, 2001. But because we held above that Carter was entitled to reemployment benefits beginning on July 14, 1994, that is the date on which interest began running on the first payment due. We consequently remand for calculation of the amount of interest B & B owes Carter, at the applicable statutory rate.

### E. Carter's Attorney's Fees Request Should Be Reconsidered on Remand.

Carter argues that the superior court failed to award him "full reasonable attorney's fees" in his superior court appeal. There is no reason for us to consider this issue.

Because Carter did not prevail on his PTD claim below, the superior court only awarded Carter partial attorney's fees and costs. Since we are reversing with respect to Carter's PTD claim, the superior court should reconsider the issue of attorney's fees and costs and may request supplemental affidavits and memoranda on the matter.

### IV. CONCLUSION

We therefore REVERSE and REMAND for further proceedings consistent with this opinion.

BRYNER, Justice, not participating.

---

**50.** *Rydwell v. Anchorage Sch. Dist.,* 864 P.2d 526, 530 (Alaska 1993).

**51.** *See Carlson v. Doyon Universal–Ogden Servs.,* 995 P.2d 224, 230 n. 45 (Alaska 2000) (stating in dictum that if employee had actively pursued

reemployment benefits it might have been appropriate to award reemployment benefits retroactively to remove gap between expiration of PPI and initiation of reemployment benefits).