*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KIEL L. CAVITT, | ) | |
| | ) | Supreme Court No. S-17441 |
| Appellant, | ) | |
| | ) | Alaska Workers' Compensation |
| v. | ) | Appeals Commission No. 18-012 |
| | ) | |
| D&D SERVICES, LLC d/b/a NOVUS | ) | O P I N I O N |
| AUTO GLASS and OHIO | ) | |
| CASUALTY INSURANCE | ) | No. 7461 – June 19, 2020 |
| COMPANY (LIBERTY MUTUAL | ) | |
| INSURANCE COMPANY), | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: Keenan Powell, Law Office of Keenan Powell, Anchorage, for Appellant. Martha T. Tansik, Barlow Anderson, LLC, Anchorage, for Appellees.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

MAASSEN, Justice.

## I. INTRODUCTION

A worker sought an order from the Alaska Workers' Compensation Board requiring his employer to pay for medical care for his serious elbow injury for the rest

of his life.  The Board ordered only that the employer "pay future medical costs in accordance with the [Alaska Workers' Compensation] Act," and the Alaska Workers' Compensation Appeals Commission affirmed the Board's decision.  We construe the Commission's decision as requiring the employer to provide periodic surveillance examinations until another cause displaces the work injury as the substantial cause of the need for this continuing treatment, and with that construction — consistent with the medical testimony — we affirm it.

## II.    FACTS AND PROCEEDINGS

In August 2015 Kiel Cavitt was working for D&D Services, repairing a motor home's windshield, when he fell from a scaffold onto concrete and fractured his right elbow.  He suffered what is known as a "terrible triad" fracture, which has three components:  dislocation of the elbow (which can result in ligament injury), fracture of the radial head, and fracture of the ulnar coronoid process.[1]  Cavitt soon had surgery which included an implanted prosthesis for the radial head.  The surgeon, Dr. Kenneth Thomas, testified that "typical" complications following surgery for a terrible triad fracture include pain, decreased range of motion, infection, and the "need for further surgery."

Cavitt appeared to recover well from the surgery, but several months later he began to experience "shooting electrical pain" in his elbow. Doctors thought the pain was "neuropathic in nature [but] of somewhat unclear etiology" and attempted to manage

---

[1]     Ke Xiao et al., *Anatomy, Definition, and Treatment of the "Terrible Triad of the Elbow" and Contemplation of the Rationality of this Designation*, 7 ORTHOPAEDIC SURGERY, Feb. 2015, at 15.  The coronoid process "plays a major role in keeping the elbow stable"; it is part of the ulna where it meets the humerus. *Id.* at 13.  A terrible triad fracture has historically "had an unsatisfactory prognosis, almost unavoidably causing long-standing postoperative pain, elbow instability[,] and a range of complications." *Id.* at 17.

the pain with medication. Cavitt was unable to return to his former work as a glazier because of restrictions on his use of the arm, and he started a new job delivering pizza.

In February 2017 Cavitt fell while on a delivery. The prosthesis came loose, and he had to have another surgery. D&D Services initially controverted benefits on grounds that Cavitt had reached medical stability following the 2015 injury and that there was insufficient evidence of the new injury's cause. But after D&D Services' own examining physician, Dr. R. David Bauer, concluded that the need for the second surgery was due to the 2015 injury, the company accepted the claim's compensability and paid benefits. A tissue sample from the surgery showed the presence of bacteria, and Cavitt was referred for evaluation to an infectious disease specialist, who began antibiotic treatment in late 2017.

Following up in November 2017, Dr. Thomas predicted that Cavitt would "most likely have reached maximum medical stability" by the one-year anniversary of his second surgery, that is, in approximately July 2018. In January 2018, however, Cavitt attended another employer's medical examination (EME) with Dr. Bauer, who reported that Cavitt was already medically stable and no longer needed medical care related to the injury. Dr. Bauer also thought Cavitt had the capacity to do sedentary work, though he recommended a functional capacities evaluation. Dr. Thomas concurred with Dr. Bauer's report.

Cavitt filed a written workers' compensation claim for benefits, including continuing temporary total disability (TTD). D&D Services controverted TTD and other benefits, including medical costs after January 25, the date of the EME, except for the functional capacities evaluation Dr. Bauer had recommended.

Cavitt again showed symptoms of infection. After his doctors recommended more treatment, D&D Services scheduled another EME. Dr. Bauer thought the substantial cause of a possible infection was the work injury, so D&D

Services modified its controversion of TTD benefits to include "such time periods as the employee does not have an off work note and is considered medically stable." It also modified its controversion to authorize expenses related to "hardware removal surgery," which the parties had stipulated should be performed. But Cavitt then had a tissue biopsy that showed no infection, and the contemplated surgery was put off.

In May 2018 the parties deposed Dr. Thomas, who described Cavitt's need for future treatment. Dr. Thomas testified that Cavitt should be seen every year or two for "[s]urveillance . . . . to make sure that the components [were] still functioning properly, to do a physical examination, radiographic examination"; these exams should be more frequent if symptoms increased. Asked about the need for future replacement surgeries, Dr. Thomas testified that the prostheses usually lasted only ten years, but he did not lay out a specific timetable: In ten years the prosthesis "would have a risk or an increased likelihood of needing replacement," but he could not "say it would be required" at that time. He also testified that Cavitt was at increased risk of another infection and would likely always be limited to sedentary work because of the injury; he outlined conservative treatment to address Cavitt's symptoms.

The Board held a hearing in May 2018 on a number of issues, with Cavitt as the only witness. In their presentations to the Board the parties interpreted Dr. Thomas's deposition testimony differently, but as one member of the Board panel observed, "[T]here's just not much of a dispute about the relationship between the work injury and the complaints that Mr. Cavitt currently has about the condition of his arm." Contending that he had faced "difficulties . . . getting the employer/insurer to live up to its obligations," Cavitt asked the Board to forestall future problems by entering a specific payment order, ensuring that he received future medical benefits "for his right elbow injury for the rest of his life." In opposition, D&D Services was not willing "to wholesale say . . . [it was] going to pay for [Cavitt's] treatment for a lifetime because if

he were to run off of a bridge and jump down goofing off on a skateboard or something . . . and landed right directly on the elbow," it would contest compensability. D&D Services pointed out that no controversion was in place at the time of the hearing and argued that there was no need to preauthorize care.

The Board issued a lengthy decision granting some of Cavitt's claims and denying others. For purposes of this appeal the only relevant order concerns future medical costs: that D&D Services "pay future medical costs in accordance with the Act." The Board summarized Dr. Thomas's testimony as concluding that "[w]hether or when the surgery will be necessary" and what type of surgery Cavitt would need were unknown. The Board believed that Dr. Thomas had qualified his recommendation for annual surveillance exams: "[W]hile Dr. Thomas recommended follow-ups at least annually, he also stated that would be 'until further notice.' " The Board concluded, "Without specific recommendations from [Cavitt's] treating physicians, an order for future medical treatment can do no more than require [D&D Services] to pay reasonable and necessary future medical costs, which the Act already requires it to do." The Board therefore entered its order requiring D&D Services "to pay future medical costs in accordance with the Act."

Cavitt appealed several issues to the Commission but ultimately briefed only the medical benefits question and an issue related to unfair or frivolous controversion. The Commission affirmed the Board's decision. It saw "no need for a prospective determination of compensability," noting that D&D Services had conceded compensability while "continu[ing] to question when and what future medical treatment [Cavitt] may need." The Commission acknowledged Dr. Thomas's testimony that "future treatment should include annual check-ups and eventual replacement of [Cavitt's] prosthesis," but it said that "D & D has the right to investigate the treatment sought and to determine whether his work injury is still the substantial cause for the medical

treatment sought by Mr. Cavitt," implicitly including the annual check-ups. The Commission cautioned, however, that the Board's order meant that "D & D will need significant reason to question any future treatment."

Cavitt appeals the Commission's decision as it relates to future medical benefits.

## III.   STANDARD OF REVIEW

In an appeal from the Commission, we review the Commission's decision.[2] When we review the Commission's conclusions about the Board's exercise of discretion, we "independently assess the Board's rulings and in so doing apply the appropriate standard of review."[3]

## IV.   DISCUSSION

### A.   The Commission Did Not Err In Affirming The Board's Decision.

Medical care for work-related injuries is a key facet of workers' compensation. Alaska Statute 23.30.095(a) requires an employer to

> furnish medical, surgical, and other . . . treatment . . . for the period which the nature of the injury or the process of recovery requires, not exceeding two years from and after the date of injury to the employee. . . . [I]f continued treatment or care or both beyond the two-year period is indicated, the injured employee has the right of review by the board. The board may authorize continued treatment or care or both as the process of recovery may require.

In *Municipality of Anchorage v. Carter* we held that "an injured employee may raise the presumption that a claim for continuing treatment or care comes within the provisions of AS 23.30.095(a), and that in the absence of substantial evidence to the contrary this

---

[2]   *Smith v. CSK Auto, Inc.*, 204 P.3d 1001, 1007 (Alaska 2009).

[3]   *Id.*

presumption will satisfy the employee's burden of proof as to whether continued treatment or care is medically indicated."[4]

Cavitt relies on the presumption to argue that the Commission and the Board erred as a matter of law by not ordering the lifetime medical care he sought for his elbow. He argues that he attached the presumption that (1) "he would need further elbow revisions"; (2) he "would need further elbow surgeries in addition to elbow revisions"; and (3) he "is entitled to life-time follow-ups." He maintains that because D&D Services offered no medical evidence to rebut the presumption, the Board and Commission erred in not awarding him the care he requested. Relying on a case about permanent total disability benefits,[5] he asserts that when an employer does not rebut the presumption, the employee is entitled to benefits as a matter of law. He also argues that the Commission and the Board misconstrued parts of Dr. Thomas's testimony.

D&D Services responds that any order beyond the one the Board entered — for "future medical costs in accordance with the Act" — would be improperly speculative. It maintains that because Dr. Thomas's testimony about future treatment lacked certainty, it was appropriate for the Board and the Commission to defer any order about whether future care was necessary and reasonable, also noting that because "Cavitt is entitled to the presumption of compensability for his medical benefits going forward," there was no "need for a specific order." D&D Services points out that under the new causation standard, "an intervening incident can usurp the original injury" in the causation analysis, "even just for a period of time." It argues that in *Municipality of*

---

[4]     818 P.2d 661, 664-65 (Alaska 1991).

[5]     *See Carter v. B & B Constr., Inc.*, 199 P.3d 1150, 1157-58 (Alaska 2008) (holding that when doctor testified that employee's work injury was substantial factor in bringing about permanent total disability, employer's rebuttal evidence was insufficient to overcome presumption of compensability).

*Anchorage v. Carter* we "affirmed that an employer must be able to rebut the presumption to not pay for recommended medical treatment" and that the Board has discretion not to award continuing benefits. D&D Services does not address Cavitt's argument that the Board misunderstood parts of Dr. Thomas's testimony.

In reply, Cavitt asserts that his case is "remarkably similar" to *Carter*. He says the claimant in that case sought care on an as-needed basis, which the Board denied, and that we affirmed the superior court's decision that "only upon adequate rebuttal by his employer would Carter's burden of proof require that he persuade the Board by a preponderance of evidence."

In *Carter* we decided that the presumption of compensability applies to claims for medical care after the first two years following an injury, but only to the fact question whether medical care beyond two years is "indicated."[6] We further held, as D&D Services emphasizes, that

> the Board retains discretion not to award continued care or treatment or to authorize care or treatment different from that specifically requested based on the requirements demonstrated either by the employee's raised and unrebutted presumption, or by the preponderance of the evidence, as further informed in each case by the "Board's experience, judgment, observations, unique or peculiar facts of the case, and inferences drawn from all of the above."[7]

Thus, under *Carter*, the question whether any care beyond two years is "indicated" is one of fact to which the presumption applies, but the reasonableness and necessity of any

---

⁶    *Carter*, 818 P.2d at 664-65.

⁷    *Id.* at 665 (quoting *Kodiak Oilfield Haulers v. Adams*, 777 P.2d 1145, 1151 (Alaska 1989)).

given care are discretionary questions left to the Board.[8]

Applying this analysis, we agree that Cavitt's need for continuing care was established as fact by the presumption. Dr. Thomas's testimony clearly showed that Cavitt's condition will require continued medical care and treatment beyond the statutory two-year mark. D&D Services did not seriously contest this at the hearing. But although the presumption applied to the factual question of the need for continuing care, the Board retained the discretion to decide whether Cavitt's specific request was reasonable and necessary, even if D&D Services did not offer medical evidence in an attempt to rebut the presumption.

Cavitt relies on *Bockness v. Brown Jug, Inc.*,[9] *Phillip Weidner & Associates v. Hibdon*,[10] and *Summers v. Korobkin Construction*[11] to support his contrary view, but these cases do not support the limits on Board discretion that he proposes. In *Bockness* we explicitly rejected the "argument that employers must pay for any treatment obtained during a temporary period of medical instability," emphasizing that "[t]he text of the Act itself, along with [our] judicial interpretation [of it], indicates that Alaska's statutory scheme limits an employer's responsibility to medical care that is reasonable and necessary."[12] In *Hibdon* we addressed claims for medical treatment within two years of the date of injury.[13] We noted that the Board's review in that context was "limited to

---

[8] *Id.* at 664-66.

[9] 980 P.2d 462 (Alaska 1999).

[10] 989 P.2d 727 (Alaska 1999).

[11] 814 P.2d 1369 (Alaska 1991).

[12] 980 P.2d at 466-67.

[13] 989 P.2d at 730-32.

whether the treatment sought [was] reasonable and necessary," though we contrasted this with the Board's review of "a claim for continued treatment beyond two years from the date of injury," when — as in this case — "it has discretion to authorize 'indicated' medical treatment 'as the process of recovery may require.' "[14]

In *Summers* an employer, without conceding compensability, withdrew its controversion of specific benefits before a hearing; the Board then declined to hold a hearing, reasoning that there was no "current dispute."[15] We reversed the Board's decision, interpreting AS 23.30.110(c) as requiring the Board to hold a hearing on compensability whenever a worker files a written claim regardless of whether there is a standing controversion of specific benefits.[16] Since then the Board has appropriately cited *Summers* when considering claims for specific future medical care or care recommended for the near future.[17] We discussed with approval this application of *Summers* in *Bockus v. First Student Services*, in which the Board had construed *Summers* as allowing the claimant to obtain a prospective determination of the compensability of

---

[14] *Id.* at 731 (quoting *Municipality of Anchorage v. Carter*, 818 P.2d 661, 664 (Alaska 1991)).

[15] 814 P.2d at 1370.

[16] *Id.* at 1371.

[17] *See, e.g.*, *Wood v. Quest Diagnostic, Inc.*, AWCB Dec. 10-0065 at 39, 2010 WL 1538885, at *29 (Apr. 5, 2010) (ordering employer to pay for future, unscheduled knee replacement surgery); *Andrews v. McGrath Light & Power, Inc.*, AWCB Dec. 05-0236 at 15-17, 2005 WL 2319177, at *11 (Sept. 14, 2005) (ordering employer to pay for shoulder surgery when employer accepted compensability of shoulder injury); *Gillespie v. Our House, an Assisted Living Family*, AWCB Dec. 05-0202 at 9-10, 2005 WL 1861525, at *7, *11 (Aug. 3, 2005) (ordering proposed knee surgery when employer accepted compensability of knee injury and additionally ordering medical benefits "as may reasonably be required").

a fusion surgery he was then attempting to schedule.[18] We reinstated the Board's award of attorney's fees to the successful claimant.[19] We did not directly address whether an employer's statutory duty to provide medical care "includes a general duty to preauthorize treatment," but we did observe that "a worker may be unable to get needed treatment without some assurance . . . that the carrier will pay for [it]."[20] A prospective determination of compensability addresses this concern.

By statute, as noted above, the Board has the discretion to "authorize continued treatment or care or both as the process of recovery may require" when a worker's injury requires continued care more than two years after the injury.[21] The necessity and reasonableness of care involve factual issues and must be assessed individually in each case. Cavitt sought an open-ended order requiring payment for future surgeries that his doctor could not say with certainty would be needed at a specific time or for a specific reason. While Dr. Thomas testified that annual to biennial examinations for surveillance were reasonable and necessary on an ongoing basis, most of his recommendations were contingent in their timing or necessity or both. For example, when asked whether "the current implant" would require replacement in ten years, he answered, "It wouldn't be required, no. . . . It would have a risk or an increased likelihood of needing replacement. I can't say it would be required."

Relevant to D&D Services' responsibility for Cavitt's future treatment is the change in the compensability standard from "a substantial factor" to "the substantial

---

[18] 384 P.3d 801, 806-07 (Alaska 2016).

[19] *Id.* at 811.

[20] *Id.* at 808.

[21] AS 23.30.095(a).

cause."[22] In its discussion, the Commission recognized that D&D Services retained "the right to investigate the treatment sought and to determine whether [Cavitt's] work injury is still the substantial cause for the medical treatment." Cavitt criticizes the Commission's decision, saying "there was no evidence whatsoever to suggest that there would be any causation other than work-relatedness for future treatment." He contends that the employer's argument about the possibility of a future sports injury displacing work in the causation chain is speculative and not based on evidence.

Also speculative, however, is the question whether Cavitt will need an elbow replacement surgery in ten years. Cavitt's young age at the time of the injury, the injury's severity, and its likely complications all point toward the future need for compensable medical care, but the Board could reasonably decide, as it did here, to wait and see. As the Commission observed, "[M]edicine is an evolving field," and what seems reasonable now may be obsolete or outmoded in 10 or 15 years.

We emphasize that the Board's decisions about the reasonableness and necessity of future medical care are fact-specific. The Board must in each case balance an employer's ability to investigate a medical claim and a worker's need for some measure of predictability. The Board should consider how specific or immediate the treatment recommendation is and how likely it may be that another, non-work-related cause will displace work in the causation analysis. The Board balanced these factors in Cavitt's case, and we agree with the Commission that it acted within its discretion in crafting the order it did here.

---

[22]     *See Morrison v. Alaska Interstate Constr., Inc.*, 440 P.3d 224, 236 (Alaska 2019) (noting change in compensability standard); *see also* Ch. 10, § 9, FSSLA 2005.

**B. Annual Or Biennial Surveillance Checkups Are Reasonable And Necessary Unless Their Work-Related Cause Is Displaced By A New Substantial Cause**.

Our agreement with the Commission's decision comes with a caveat. One part of Cavitt's future care that Dr. Thomas was certain about was the need for annual or biennial surveillance exams of Cavitt's elbow to check its functioning and hardware. The Board found that "while Dr. Thomas recommended follow-ups at least annually, he also stated that would be 'until further notice.' " The Commission agreed with the Board's reading of Dr. Thomas's testimony.

Cavitt contends, however, that the Board took the words "until further notice" out of context, and we agree. The phrase "until further notice" appears in Dr. Thomas's deposition only in an attorney's question about "treatment in the near future": Dr. Thomas agreed that recommended treatment was "continued monitoring with follow-ups and continu[ing] with physical therapy and routine follow-up," "routine follow-ups" meaning that "he's scheduled to come in periodically . . . [u]ntil further notice." But the context of the question was the then-current treatment for Cavitt's "continued pain in his elbow." Questions about long-term care — "follow-up medical treatment for his elbow for the rest of his life" — came earlier in the deposition. In that context Dr. Thomas's testimony was unequivocal. He answered "yes" when asked whether "coming in once a year would be reasonable and necessary" for exams that Dr. Thomas described as for "[s]urveillance": "Just to make sure that the components are still functioning properly, to do a physical examination, radiographic examination." And while agreeing that annual exams were "reasonable and necessary," Dr. Thomas testified that Cavitt should come in more often "[i]f there is increasing pain, decreasing range of motion, mechanical symptoms, deformity, things like that."

Although we thus conclude that the Board and the Commission read Dr. Thomas's testimony too narrowly, we are able to affirm the Commission's ultimate decision — that "Cavitt is entitled to medical treatment in accordance with the requirements of the Act" — by observing that periodic follow-up exams are reasonable and necessary, and therefore part of Cavitt's compensable medical treatment,[23] unless and until the Board determines that a cause other than the work-related fall is the substantial cause of Cavitt's elbow condition. As the Commission noted, D&D Services will "need significant reason to question any future treatment Mr. Cavitt may seek," a caution which we believe is particularly applicable to the follow-up exams. With this interpretation of the Board's order, we agree with the Commission that the Board did not abuse its discretion when it ordered D&D to provide future medical care in accordance with the requirements of the Act.

## V.     CONCLUSION

We AFFIRM the Commission's decision.

---

[23]     *See Bockness v. Brown Jug, Inc.*, 980 P.2d 462, 466 (Alaska 1999) (construing AS 23.30 as limiting an employer's responsibility "to medical care that is reasonable and necessary").