PHILLIP WEIDNER & ASSOCIATES, INC., and Alaska National Insurance Company, Appellants,

v.

Stacey HIBDON, Appellee.

No. S–8350.

Supreme Court of Alaska.

Oct. 8, 1999.

Richard L. Wagg and Patricia K. Shake, Russell, Tesche, Wagg, Cooper & Gabbert, Anchorage, for Appellants.

Phillip J. Eide, Eide & Miller, Anchorage, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

## I. INTRODUCTION

Phillip Weidner & Associates, Inc. and Alaska National Insurance Company appeal the superior court's decision remanding a decision of the Alaska Workers' Compensation Board with instructions to authorize Stacey Hibdon's medical claim for future back surgery if a new examination determines the procedure is still medically warranted. Because Hibdon presented substantial evidence that the treatment she sought was reasonable and medically necessary, we affirm.

## II. FACTS & PROCEEDINGS

### A. Factual History

Stacey Hibdon suffered an on-the-job-injury to her back on June 24, 1993. She was moving files and file cabinets for her employer, Phillip Weidner & Associates, when a file cabinet fell on her.[1] Following this injury, Hibdon experienced acute back pain and went to see a chiropractor; he referred her to Dr. Garner, an orthopedic surgeon. During an evaluation on July 15, 1993, Dr. Garner assessed an acute left L4 Pars defect[2] and possible lumbar disc herniation. While the condition appeared to be pre-existing and asymptomatic, the injury at work aggravated the defect and resulted in symptomatic lower back pain which radiated into her extremities.[3] Dr. Garner then re-

---

1. Hibdon asserts that two additional work-related injuries further aggravated her condition. She contends that she was in a head-on motor vehicle accident on December 17, 1993, while making an office delivery, and that she was knocked down, jumped on, and dragged across Weidner's yard by his dog on January 2, 1995.

2. This is a defect or lesion in the bridge of bone between two small joints in the vertebrae.

3. It is well established in workers' compensation law that when a work-related injury aggravates a pre-existing condition a compensable claim

ferred Hibdon to Dr. Peterson, another orthopedic surgeon, for a second opinion; he confirmed Dr. Garner's diagnosis and determined that Hibdon was a reasonable surgical candidate for a Pars repair. Dr. Peterson also recommended a molded body jacket to see if this would alleviate her pain and help stabilize her back.

In August 1993 a bone scan and MRI ordered by Dr. Garner indicated that the Pars defect had failed to heal and that Hibdon suffered from a degenerative and herniated disc. Dr. Garner felt that the defect's failure to heal indicated it would not heal on its own, and recommended that Hibdon undergo a L4–5 fusion and decompression, or "floating fusion."

As a result of that recommendation, the employer's insurance carrier, Alaska National, sent Hibdon to California for another opinion. Drs. Gerald Keane and Arthur White, specialists, respectively, in physiatry and orthopedics, evaluated Hibdon in late September and stated that she should not have surgery at that time because she had not had sufficient conservative treatment nor had diagnostic tests isolated the pain generators.

Dr. Keane again evaluated Hibdon in December 1993 and noted that since her last visit she had undergone his recommended course of physical therapy in Anchorage, but that her progress seemed limited and bilateral pain persisted in her lower back. Nevertheless, he recommended against surgical intervention because he did not "believe that the potential risk of surgery in her case justifie[d] the limited chance of potential benefit." Moreover, he did not feel further diagnostic testing would be beneficial. He recommended Hibdon continue physical therapy over the ensuing three to four weeks and then begin an independent exercise program.

Hibdon then went back to see Dr. Garner. He noted that although she had been wearing her back brace and had undergone six to eight weeks of hands-on therapy, she was not relieved of pain.[4] X-rays showed that she actually had more gap in the Pars defect. Dr. Garner's assessment was that Hibdon had "had a reasonable trial of conservative care" and continued to be a "reasonable candidate for a one level decompression fusion." Dr. Garner then consulted with Dr. Benson of the University of California at Davis, a spine specialist. After reviewing Hibdon's medical records, Dr. Benson agreed that if conservative treatment had failed, a decompression and fusion would be a reasonable surgical option.

As of March 17, 1994, Hibdon was "not anxiously pursuing surgery" so Dr. Garner felt it appropriate "to rate her for permanent partial impairment." However, he indicated she may yet decide to pursue surgery and that her chances "for a reasonable surgical outcome" were not seriously hindered by a delay of up to six to twelve months. If she went beyond an additional six months, however, he indicated he would want to repeat the MRI to ensure that the operation need only deal with the L4–5 disc lesion.

Hibdon's back pain persisted, and she again saw Dr. Garner in January 1995. His assessment indicated that, despite exercising with rubber bands and ankle weights, her back pain was not alleviated; worsened the longer she stood and prevented her from sitting in many types of chairs; and radiated into her calf and toes, causing intermittent numbness. X-rays and an MRI scan showed there had not been any healing of the Pars defect. Dr. Garner reiterated his assessment that conservative long-term care would not be adequate for Hibdon, and indicated that she would be well served by a "floating fusion" at L4–5 if a new MRI indicated the disc pathology had not spread. He again

---

arises. *See Burgess Constr. Co. v. Smallwood,* 623 P.2d 312, 315 (Alaska 1981) (listing cases).

4. Between Dr. Garner's second evaluation in late August and his third in December, he did not see Hibdon. However, Dr. Garner made a note in her file on November 24 that he was told in late October by an employee at Alaska National that she had informed Alaska National she no longer

wished to see Dr. Garner. Hibdon denies she ever expressed this sentiment to Alaska National. In any event, Dr. Garner expressed his view in the file on November 24 that Hibdon was not likely to recover with conservative care because she had both a Pars defect and a defective disk with herniation all at the same motion segment.

referred her to Dr. Peterson for a second opinion, who concurred with Dr. Garner's assessment and stated that "she should strongly be considered" for surgery. As of February 24, 1995, Dr. Garner was prepared to proceed with surgery. However, Alaska National would not authorize surgery, so he declined to schedule it.

In May 1995 Hibdon was again evaluated by Drs. Keane and White, and once again they expressed the opinion that she did not need surgery.

Hibdon has since moved from Anchorage to Florida because her husband, who is on active duty with the Air Force, has been transferred.

### B. *Procedural History*

Hibdon filed a report of injury for the June 24, 1993 incident on July 1, 1993. She filed an application for adjustment of her claim with the Workers' Compensation Board on April 18, 1995, after her employer controverted her medical benefits claim for surgery. She sought, among other things, preapproval to visit a qualified physician in Florida and, if surgery were again recommended, preapproval for such treatment. Drs. Garner, Keane, and White were deposed in December 1995 and January 1996.

A hearing was held in March 1996, and the Board issued a Decision and Order in May denying Hibdon's claim for future back surgery, and her claim for attorney's fees and costs. Discounting Dr. Garner's testimony and finding that she lacked a current medical recommendation for surgery, the Board held that Hibdon had failed to prove her claim by a preponderance of the evidence. Accordingly, it denied her claim for future back surgery and further stated it would not order surgery if a physician of her choice provided her with a current medical recommendation for such treatment.

Hibdon appealed this decision to the superior court. The court held that the Board's decision was not supported by the record, and remanded the case back to the Board with instructions to authorize both payment for Hibdon to see an orthopedic surgeon in her present locale and payment for surgery if the new surgeon found it medically warranted. In its order, the court further stated that the Board should not have overridden "a consensus reached in the physician-patient decision-making process." Finally, the court awarded Hibdon attorney's fees and costs.

This appeal followed.

### III. *STANDARD OF REVIEW*

■■■■ We do not defer to the superior court when it acts as an intermediate court of appeal; rather, we independently review the decisions of administrative agencies.[5] We review agency findings under the substantial evidence standard, asking whether those findings are supported by "such relevant evidence as a reasonable mind might accept to support a conclusion."[6] We review questions of law under the independent judgment standard, adopting the rule of law most persuasive in light of reason, precedent, and policy.[7]

### IV. *DISCUSSION*

Weidner and Alaska National argue that the superior court erred in ruling that the Board's decision denying surgery was not supported by substantial evidence. They do not deny that Hibdon is entitled to medical benefits as a result of her work-related injury, only that the Board did not abuse its discretion in determining that surgery was not appropriate for her based upon the evidence before the Board at that time.

Hibdon responds that she presented ample evidence that the surgery she sought was a reasonable medical option, and that the Board wrongfully interfered with a reasonable treatment decision made by her and her physician, without a basis in the record. We

---

5. *See Williams v. State, Dep't of Revenue*, 938 P.2d 1065, 1069 (Alaska 1997) (citation omitted).

6. *Grove v. Alaska Constr. & Erectors*, 948 P.2d 454, 456 (Alaska 1997) (quoting *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1046 (Alaska 1978)).

7. *See id.* at 456 (citing *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

agree with her, and therefore affirm the superior court.

### A. *Hibdon's Claim Was Made Within Two Years of Her Injury; Therefore, the Board's Review Was Limited to Whether Her Requested Treatment Was Reasonable and Necessary.*

■ Under Alaska's Workers' Compensation Act, an employer shall furnish an employee injured at work any medical treatment "which the nature of the injury or process of recovery requires" within the first two years of the injury.[8] The medical treatment must be reasonable and necessitated by the work-related injury.[9] Thus, when the Board reviews an injured employee's claim for medical treatment made within two years of an injury that is undisputably work-related, its review is limited to whether the treatment sought is reasonable and necessary.[10]

■ On the other hand, when the Board reviews a claim for continued treatment beyond two years from the date of injury, it has discretion to authorize "indicated" medical treatment "as the process of recovery may require."[11] Given this discretion, the Board is not limited to reviewing the reasonableness and necessity of the particular treatment sought, but has some latitude to choose among reasonable alternatives.[12]

In the present case, Hibdon filed an injury report for the June 24, 1993 incident on July 1, 1993. Weidner and Alaska National conceded the injury was work-related, but controverted Hibdon's claim for back surgery. She then filed an application in April 1995 for an adjustment of her claim. This was within two years of the date of the injury. Therefore, her claim may be reviewed only to determine whether the treatment she sought in her claim was reasonable and necessary.

■ Weidner and Alaska National mistakenly argue that because Hibdon is seeking medical treatment beyond two years from the date of injury, the Board has greater latitude in its determination. This confusion is understandable as the treatment sought, if approved, would have occurred outside the initial two-year period due to the time required for the Board's adjudicative process to run its course. However, Hibdon sought and was ready to undergo this treatment by April 1995 at the latest—well within two years of the date of injury. She did not go forward because Weidner and Alaska National controverted her claim. It would be unjust to allow an employer to avoid the more stringent benefit requirements owed to injured employees in the first two years following an injury by simply controverting a claim and delaying the employee's medical treatment beyond the two years. Accordingly, we hold that a claim for medical treatment is to be reviewed according to the date the treatment was sought and the claim was filed with the

---

**8.** AS 23.30.095(a). This provision states:

The employer shall furnish medical, surgical, and other attendance or treatment, nurse and hospital service, medicine, crutches, and apparatus for the period which the nature of the injury or the process of recovery requires, not exceeding two years from and after the date of injury to the employee. However, if the condition requiring the treatment, apparatus, or medicine is a latent one, the two-year period runs from the time the employee has knowledge of the nature of the employee's disability and its relationship to the employment and after disablement. It shall be additionally provided that, if continued treatment or care or both beyond the two-year period is indicated, the injured employee has the right of review by the board. The board may authorize continued treatment or care or both as the process of recovery may require. When medical care is required, the injured employee may designate a licensed physician to provide all medical and related benefits. The employee may not make more than one change in the employee's choice of attending physician without the written consent of the employer. Referral to a specialist by the employee's attending physician is not considered a change in physicians. Upon procuring the services of a physician, the injured employee shall give proper notification of the selection to the employer within a reasonable time after first being treated. Notice of a change in the attending physician shall be given before the change.

**9.** *See Bockness v. Brown Jug, Inc.,* 980 P.2d 462, 466 (Alaska 1999).

**10.** *See* AS 23.30.095(a)-.395; *see also Bockness,* 980 P.2d at 466.

**11.** *Municipality of Anchorage v. Carter,* 818 P.2d 661, 664 (Alaska 1991).

**12.** *See id.* at 665.

Board. Because Hibdon's claim was filed within two years of the date of injury, we must determine whether the treatment she sought was reasonable and necessary.

B. *The Board Erred in Finding that Hibdon Did Not Prove Her Claim by a Preponderance of the Evidence.*[13]

■ Weidner and Alaska National argue that the Board's denial of Hibdon's claim for future back surgery was supported by substantial evidence in the form of testimony from Drs. Keane and White. They further contend that because the superior court impermissibly reweighed the evidence, and no medical provider was currently recommending surgery for her, the superior court should be reversed and the Board's decision affirmed. We disagree, and hold that Hibdon proved her claim by a preponderance of the evidence. Further, we find that the Board exceeded its authority when it overrode the consensus reached between Hibdon and her doctors about what treatment was appropriate.

■ According to Professor Larson's treatise on workers' compensation, where a claimant receives conflicting medical advice, the claimant may choose to follow his or her own doctor's advice, so long as the choice of treatment is reasonable.[14] The question of reasonableness is "a complex fact judgment involving a multitude of variables."[15] However, where the claimant presents credible, competent evidence from his or her treating physician that the treatment undergone or sought is reasonably effective and necessary for the process of recovery, and the evidence is corroborated by other medical experts, and the treatment falls within the realm of medically accepted options, it is generally considered reasonable. If the employee makes this

showing, the employer is faced with a heavy burden—the employer must demonstrate to the Board that the treatment is neither reasonable and necessary, nor within the realm of acceptable medical options under the particular facts. It is not the Board's function to choose between reasonable, yet competing, medically acceptable treatments. Rather, the Board must determine whether the actual treatment sought by the injured employee is reasonable.

In the present case, Hibdon presented ample evidence that the surgery she sought was a reasonable medical procedure necessary for her recovery process. Her treating physician, Dr. Garner, came to his recommendation to perform surgery after extensive testing, including bone scans, two MRI's, and x-rays. Hibdon was also seen twice by Dr. Peterson, an orthopedic surgeon and colleague of Dr. Garner's. Finally, Dr. Garner sought the advice of Dr. Benson, a spine specialist from the University of California at Davis. All three of these doctors came to the conclusion that the persistent and debilitating pain experienced by Hibdon could be alleviated by a surgical procedure involving a fusion to the L–4 vertebral segment of her spine. Moreover, Drs. Keane and White both admitted under cross examination that fusion surgery often makes sense for patients with a Pars defect, that surgery could potentially benefit Hibdon, and that Dr. Garner's recommended course of treatment was "within the realm of medically accepted options."

■ Nevertheless, the Board found, and Weidner and Alaska National argue on appeal, that Hibdon lacked a current medical recommendation to go forward with surgery. Dr. Garner did admit that he would want to run additional diagnostic tests before renewing his recommendation for surgery. How-

---

**13.** The parties do not address the Board's determination that the presumption of compensability contained in AS 23.30.130(a) attached to Hibdon's claim, nor that Weidner and Alaska National overcame the presumption with substantial evidence. For purposes of this opinion, we assume, without deciding, that Weidner and Alaska National rebutted the presumption of compensability with the testimony of Drs. Keane and White. After the presumption of compensability was rebutted, Hibdon's burden was to prove her claim by a preponderance of the evi-

dence. *See Gillispie v. B & B Foodland,* 881 P.2d 1106, 1111 (Alaska 1994) (citation omitted).

**14.** *See* 1 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 13.22(e)-(f), at 3–763 to 3–789 (1997).

**15.** *Fluor Alaska, Inc. v. Mendoza,* 616 P.2d 25, 27 (Alaska 1980)(quoting 1 Arthur Larson, *The Law of Workmen's Compensation* § 13.22, at 3–419 (1978)).

ever, he also stated that if Hibdon's pain persisted, and diagnostic tests indicated her condition was the same and additional degeneration had not occurred requiring more extensive surgery, he would continue to recommend the same procedure. Hibdon's pain was increasing despite the conservative treatment she underwent and was undergoing, and the pain was radiating into her calf and toes, causing intermittent numbness. The fact is Drs. Garner, Keane, and White all agreed that she would need to undergo additional tests before surgery should be performed. But this is only because of the delay inherent in the Board's adjudication of her claim. The passage of time rendered what was a current recommendation dated, and necessitated the need for more tests to ensure the procedure was still appropriate. In such situations, a claimant is faced with a potential catch–22: by the time claims are adjudicated treatment recommendations are old, and the Board would be precluded from ordering the claim compensable without more current information. The superior court's approach correctly avoids this potential dilemma by pre-approving the recommended surgery contingent upon a new examination indicating the procedure is still medically warranted.

In sum, we conclude that the testimonial evidence presented by Dr. Garner, which was corroborated by Drs. Peterson and Benson, in addition to the admissions of Drs. Keane and White, were sufficient to establish that the treatment Hibdon sought was reasonable and necessary for her process of recovery. Neither Drs. Keane nor White disputed Hibdon's diagnosis, nor the efficacy of the surgical procedure generally in treating such defects. Rather, they argued that additional tests needed to be performed to isolate the pain generators,[16] that Hibdon was unfit for the procedure, that if surgery was performed a more extensive procedure would be required, and that in light of the risks a conservative treatment regimen was the best option. Such evidence is insufficient to support a conclusion that Hibdon was not entitled to the surgery. Choices between reasonable medical options and the risks entailed should be left to the patient and his or her physician.[17] The superior court correctly stated that the Board should not have overridden the consensus reached in the physician-patient decision-making process. We therefore hold that Hibdon proved her claim by a preponderance of the evidence.

## V. CONCLUSION

Because Hibdon presented credible, corroborated evidence from her treating physician that the treatment she sought was reasonable and necessary for her recovery, and the treatment fell within the realm of medically accepted options, she proved her claim by a preponderance of the evidence. The Board's decision denying her claim is not supported by substantial evidence in the record. Therefore, we AFFIRM the superior court's remand of this case to the Board, and order the Board to implement the superior court's instructions.

16. Notably, as early as December 1993 Dr. Keane was recommending against further diagnostic testing.

17. Cf. Fluor Alaska, 616 P.2d at 29 (recognizing that the risks of surgery are personal to the employee).