*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JONATHAN BOCKUS, | ) | |
| | ) | Supreme Court No. S-15784 |
| Appellant, | ) | |
| | ) | Alaska Workers' Compensation |
| | ) | Appeals Commission No. 14-008 |
| v. | ) | |
| | ) | O P I N I O N |
| FIRST STUDENT SERVICES and | ) | |
| SEDGWICK CMS, INC., | ) | No. 7137 – December 2, 2016 |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: J. John Franich, Franich Law Office, LLC, Fairbanks, for Appellant. Krista M. Schwarting, Griffin & Smith, Anchorage, for Appellees.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

BOLGER, Justice.

## I.     INTRODUCTION

A school bus driver injured his back moving a gate. He had two spinal surgeries, and his surgeon ultimately recommended a third. About the same time, the driver's employer scheduled a medical examination, which delayed the planned surgery: the driver's surgeon would not schedule the surgery while the employer's medical evaluation was pending. So the driver filed a workers' compensation claim for the third

surgery, and the employer's doctor ultimately agreed another surgery was appropriate. The Alaska Workers' Compensation Board awarded the driver his attorney's fees under AS 23.30.145(b), finding the employer had resisted these benefits, but the Alaska Workers' Compensation Appeals Commission reversed the fee award. We conclude there was substantial evidence supporting the Board's finding and therefore reinstate the award.

## II. FACTS AND PROCEEDINGS

Jonathan Bockus worked as a substitute bus driver for First Student Services in Fairbanks. In March 2013 he injured his back pulling open a chain-link gate; he felt a pop in his back and had severe pain radiating into his legs shortly afterwards. He was taken by ambulance to the emergency room at Fairbanks Memorial Hospital, where an MRI showed a large disc herniation at T10-T11 and resulting spinal cord impingement. Because no neurosurgeon was available in Fairbanks, Bockus was medivaced to Anchorage. In Anchorage a repeat MRI showed the same problem as well as cord edema. Dr. Kim Wright, a neurosurgeon, recommended surgical decompression of the spinal cord.

Dr. Wright attempted to perform a right T10-T11 laminectomy on March 8, but during surgery he was not able to locate the correct level of the spine due to Bockus's "body habitus." After making an incision and beginning the surgery at what he thought was the correct level, Dr. Wright did not find the expected amount of disc material. He nonetheless removed a calcified ligament and a synovial cyst. He thought he might have been off one level, but he decided it would be better to end the surgery, have a repeat MRI, and decide what to do next rather than continue to try to locate the correct level.

Another MRI done later that day showed a continuing disc herniation and "cord distortion" at T10-T11 as well as surgical changes at T11-T12. Dr. Wright performed another surgery the following day, this time at the correct level; decompressed

the spinal cord; and removed a calcified ligament and "a sizeable free fragment disc herniation." Bockus reported feeling better the following day. The imaging studies done after the second surgery showed some residual problems at the T10-T11 level, but Dr. Wright recommended to Bockus that he try conservative management because surgical treatment would require fusion.

In correspondence related to the surgery, the workers' compensation carrier asked Dr. Wright whether Bockus's work-related injury was the substantial cause of the first surgery, at the T11-T12 level; Dr. Wright responded that it was, even though the cyst was likely a preexisting condition, and explained that the work-related ruptured disc caused the need for any surgery at all. The carrier then sent Bockus's medical records to its doctor, Dr. Paul Williams, also a neurosurgeon, for review. Dr. Williams agreed both surgeries were reasonable and necessary and additionally gave the opinion that the work-related accident was the substantial cause of Bockus's thoracic back condition.

Bockus had several post-surgery visits with Dr. Wright and his staff, for which First Student paid. Bockus reported recurring pain in his mid-back, and Dr. Wright initially suggested continuing conservative care. An MRI from June showed residual disc material at T10-T11 as well as cord impingement and "severe right neural foraminal stenosis." Over the next few weeks Bockus's pain increased, Dr. Wright recommended a third surgery, and the carrier decided to have Bockus undergo an employer's independent medical evaluation (EIME) in Anchorage with Dr. Williams.

Bockus and Dr. Wright discussed further surgery in mid-July, when Bockus "report[ed] significant pain" with numbness; after considering his options Bockus decided to have a fusion surgery. At about the same time, the adjuster scheduled the EIME, initially for Saturday, July 27. Bockus had already spent a significant amount in non-refundable fees to attend a family reunion that day, so the EIME was rescheduled for September 27, Dr. Williams's next available in-person appointment. When

Dr. Wright's scheduling assistant called the workers' compensation carrier to verify coverage for the surgery, the carrier told her that the claim was open and billable but that an EIME was scheduled. The assistant did not schedule the surgery then because of office policy not to schedule surgery in the face of a pending EIME; according to the assistant this policy is meant to protect patients from being stuck "with a huge bill that they can't pay," presumably in case the EIME leads to a controversion.[1] The assistant would have gone ahead and scheduled the surgery, even with a pending EIME, if the carrier had "authorized it," but the carrier did not do so in July.

After the adjuster found out that Dr. Wright had recommended another surgery, she asked Dr. Williams to perform a records review in lieu of having an in-person appointment; she testified that Dr. Williams "was not able to opine on any of the issues because he wanted to do a physical evaluation of Mr. Bockus first." Dr. Williams's second records examination, dated July 29, indicated that he reviewed the June MRI and gave the opinion that the March work-related injury was the substantial cause of Bockus's current condition and that the preexisting conditions Dr. Williams identified in the report were not the substantial cause of Bockus's condition. He also wrote that he was "unaware of an alternate explanation" that might exclude the work-related injury as the substantial cause of Bockus's "medical complaints."

Dr. Williams declined to answer a number of other questions, including one about the reasonableness or necessity of a list of nine treatment options, without first examining Bockus. None of the questions informed Dr. Williams that Dr. Wright had

---

[1] Because an employer is subject to a penalty if it controverts benefits without a factual basis for the controversion, *see Harp v. ARCO Alaska, Inc.*, 831 P.2d 352, 358 (Alaska 1992), an EIME may be a prerequisite to a controversion of medical care. As First Student acknowledged at oral argument before us, adjusters may tell doctors about EIMEs so they know there is a possibility the carrier will deny the claim if the carrier decides the treatment is not compensable.

recommended a third surgery and thus did not ask Dr. Williams to give an opinion about whether a third surgery was necessary and "within the realm of medically accepted options"[2] for treating Bockus's condition.

Bockus saw Dr. Wright again in early August and reported increased pain. He said he could no longer stand completely upright because of the pain; the chart notes reflect that Bockus was "ready to proceed with surgery but his workers['] compensation company will not approve it until the [E]IME is completed." The care plan section of the chart notes says, "We are simply awaiting his new [E]IME and approval for surgery." The care plan also indicates that Bockus asked to see a pain management doctor "to be able to get through" until the EIME.

After contacting Dr. Wright's office and the compensation carrier several times about the surgery, Bockus sought the assistance of an attorney. The attorney wrote to the adjuster "informing [her] that the treating physician had recommended a third surgery, and that [she] was not approving the surgery unless and until it was recommended by [the carrier's] physician." The attorney then filed a written workers' compensation claim for Bockus. The claim cited *Summers v. Korobkin Construction*,[3] and alleged the carrier had controverted in fact medical care in that it had "resisted payment of medical benefits by not approving surgery that ha[d] been recommended by [the] treating physician until after an EIME."

---

      **2**     *Phillip Weidner & Assocs. v. Hibdon*, 989 P.2d 727, 732-33 (Alaska 1999) (holding that if the employee's physician recommends a course of treatment within the first two years following injury, the employer, to demonstrate that the treatment is not compensable, must prove "that the treatment is neither reasonable and necessary, nor within the realm of acceptable medical options under the particular facts").

      **3**     814 P.2d 1369 (Alaska 1991).

Bockus attended the EIME in late September. Dr. Williams did not perform a range of motion examination on Bockus's thoracic spine "for fear of causing further herniation of Mr. Bockus'[s] recurrent disc at T10-T11." Dr. Williams diagnosed a "recurrent disc herniation on the right at T10-T11"; he thought the work-related injury was still the substantial cause of Bockus's condition and thought a "[r]epeat discectomy at T10-T11" would likely bring objectively measurable improvement. He also said the "work injury remains the substantial cause of the need for treatment" because Bockus was "asymptomatic" before the injury.

Dr. Williams wrote an October 10 addendum to the report, responding to First Student's questions about the likely length of time Bockus would need physical therapy after surgery; none of the supplemental questions was related to the reasonableness or necessity of the surgery itself. The carrier approved the surgery on October 16 or 17, after Dr. Wright's office contacted the adjuster to find out why the surgery had not yet been preauthorized. First Student then filed its answer to Bockus's compensation claim on October 17, denying it had controverted medical care and asserting there was no basis for an attorney's fees award.

Bockus had the surgery in early November. First Student paid for the surgery, so by the time of the Board hearing the only unresolved issue was attorney's fees. Bockus sought attorney's fees under AS 23.30.145(a) (for a controversion in fact) or (b) (for resistance to a claim). First Student argued it had neither controverted in fact nor resisted the claim for benefits.

Bockus and the insurance adjuster testified in person at the Board hearing, and the doctor's scheduling assistant testified by deposition. Bockus testified he had made "numerous" calls to Dr. Wright's office to ask about the surgery and about three calls to the adjuster about it. He said the adjuster would tell him his claim was open but would "never say yes or no" about the surgery. He agreed the adjuster had not told him

the surgery had been denied; instead, according to Bockus, she told him she was not saying he could not have the surgery, she was "just saying that [she couldn't] tell [him] at this time." His impression was that Dr. Wright's office had contacted the adjuster to get authorization for the surgery.

The adjuster, Kymberly LaRose, testified that she initiated the EIME process a few days before Bockus told her he might need a third surgery. Bockus told her of the potential for an additional surgery when she called to "do a regular check-in"; she told him at that time that she had scheduled him for an EIME. She also said she tried to speed things up by asking the doctor to do another records review, but the doctor "was not able to opine on any of the issues because he wanted to do a physical evaluation" first.

LaRose indicated that she is "obligated" to tell a doctor's office that an EIME is scheduled, although she did not say why she has this obligation. She explained that providers call her "asking if the claim is open and billable and if there are any pending issues like an [E]IME," and "if there are no pending [E]IMEs or anything . . . [the] standard issue answer [is] that there are no issues with the claim." LaRose said she told Bockus that some providers would not proceed with surgery if they know there is a pending EIME but that she was "not able to tell him one way or another what kind of treatment they're able to perform"; she said she never told Bockus the surgery would be denied if he went ahead and had the surgery before the EIME.

LaRose testified that her office does "not preauthorize any medical treatment because [they are] unable to direct" medical treatment. She could not explain why Dr. Wright's office had sent a written request for preauthorization if her office never preauthorized surgery. She also testified that in mid-October she returned a call from Dr. Wright's office and told them "there [were] no issues with surgery being scheduled."

Nancy Nashlund, Dr. Wright's scheduling assistant, testified that when she contacted the adjuster's office about the surgery in July, a person named Adela told her the claim was "open and billable" but that an EIME was scheduled. Nashlund indicated that she did not schedule Bockus's surgery at that time because if an adjuster tells her an EIME is scheduled, "Dr. Wright has asked that [she] wait to schedule [surgery] until after the [E]IME is finished." She later agreed that she "wait[s] for the insurance company to make a decision whether they are going to pay for the surgery" before scheduling it. In response to questions from Bockus's attorney, she agreed that when she called the insurer on July 22, she "had called them to authorize" the surgery, that the carrier had not authorized it, and that if the insurer had authorized it, she would have scheduled the surgery at that time. She estimated that she would have been able to schedule the surgery within two weeks of approval, as long as Dr. Wright was in the office, and she testified that Dr. Wright was only out of the office for one week in August 2013.

In response to questions from First Student's attorney, Nashlund agreed that she did not "specifically ask [the insurer] to authorize surgery" when she called in July and said, "My understanding is that workers' comp companies don't authorize surgeries, per se . . . ." Nashlund did not recall getting a copy of the EIME after it was completed; she learned that the carrier had approved the surgery by talking to the adjuster. Nashlund agreed that the insurer had not told her to delay the surgery and had not told her the surgery was denied. She also agreed that "the surgery was authorized on October 17th."

The Board decided that attorney's fees could not be awarded under AS 23.30.145(a) because in its view any employer actions that resisted payment of medical benefits happened before the written claim was filed. The Board interpreted

*Harnish Group, Inc. v. Moore*[4] as requiring the actions constituting a controversion in fact to happen after a written claim is filed rather than before; it decided that none of the actions showing resistance to payment happened after the claim was filed. But the Board agreed that First Student had resisted furnishing medical care such that Bockus's attorney was entitled to fees under AS 23.30.145(b).

The Board spent some time discussing the testimony of both LaRose and Nashlund, noting that Nashlund's testimony was confusing because she provided different answers depending on who asked her questions. For example, she said she sought authorization for the surgery when she first called the adjuster, but also testified that she understood that workers' compensation insurers did not preauthorize surgery. The Board found some of the testimony of these two witnesses not credible because of the internal inconsistencies; it found that Dr. Wright "was not really concerned with an E[I]ME itself, but payment for [his] services." It ultimately found that neither Nashlund nor LaRose was credible "in [her] denial[] [Bockus's] provider was calling for preauthorization."

After considering several statutory provisions and *Richard v. Fireman's Fund Insurance Co.*,[5] the Board said an employer's duty to furnish medical care "could conceivably include a duty to address other payment issues, such as providing payment assurances, or at least accurately portraying the uncontroverted status of an injured worker with a compensable injury to the employee's selected provider to facilitate treatment." The Board construed *Summers v. Korobkin Construction*,[6] as providing Bockus with a remedy "[e]ven if the [Alaska Workers' Compensation] Act does not

---

[4]     160 P.3d 146 (Alaska 2007).

[5]     384 P.2d 445 (Alaska 1963).

[6]     814 P.2d 1369 (Alaska 1991).

require [First Student] to preauthorize treatment." The Board said that, even though First Student "did not have unilateral authority to terminate [Bockus's] benefits," its "refusal to preauthorize [the] surgery effectively did just that." In the Board's view, this amounted to resistance, making Bockus eligible for a fee award under AS 23.30.145(b). The Board found that Bockus's attorney had "successfully obtained a valuable benefit" for him and awarded reasonable fees and costs of approximately $3,500 for about ten hours of work.

First Student appealed to the Commission. The Commission analyzed the issues differently from the Board, considering the question presented a purely legal one; it examined whether an employer was required to preauthorize care under the Alaska Workers' Compensation Act (Act) rather than determining whether substantial evidence in the record supported the Board's finding that First Student had resisted the medical benefits at issue. It decided that one statutory subsection the Board had not considered, AS 23.30.097(d), "address[ed] paying for medical treatment in a more detailed way" than the parts of the statute the Board used.[7] The Commission next looked at case law and decided that nothing in those decisions required an employer to preauthorize surgery. The Commission decided that the only way an employee can find out "in advance whether his . . . employer must pay for certain medical treatment" is to file a claim under *Summers* so the Board can determine compensability. The Commission interpreted AS 23.30.095(a)'s requirement that the employer "furnish" medical treatment as applying only when treatment is "compensable"; here, according to the Commission, "the compensability of Bockus's third surgery was not determined until the [B]oard issued its decision to that effect."

---

[7]     AS 23.30.097(d) requires an employer to pay medical bills within 30 days.

The Commission disagreed with the Board that *Summers* had any bearing on Bockus's case except to provide him with the opportunity for a Board determination of the compensability of the surgery. Because the Commission decided that First Student had no duty to preauthorize surgery, it decided the award of fees was unjustified because Bockus had "not employed an attorney in the *successful* prosecution of his claim" (emphasis in original) and reversed the award. Bockus appeals.

## III.    STANDARD OF REVIEW

In an appeal from the Alaska Workers' Compensation Appeals Commission, we review the Commission's decision rather than the Board's.[8] We apply our independent judgment to questions of law that do not involve agency expertise.[9] We apply our independent judgment to questions of "statutory interpretation requiring the application and analysis of various canons of statutory construction,"[10] interpreting a statute "according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[11] We independently

---

[8]    *Humphrey v. Lowe's Home Improvement Warehouse, Inc.*, 337 P.3d 1174, 1178 (Alaska 2014) (citing *Shehata v. Salvation Army*, 225 P.3d 1106, 1113 (Alaska 2010)).

[9]    *Id.*

[10]    *ARCTEC Servs. v. Cummings*, 295 P.3d 916, 920 (Alaska 2013) (quoting *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903-04 (Alaska 1987)).

[11]    *Louie v. BP Exploration (Alaska), Inc.*, 327 P.3d 204, 206 (Alaska 2014) (citing *Grimm v. Wagoner*, 77 P.3d 423, 427 (Alaska 2003)).

review a Commission decision that substantial evidence supports the Board's findings of fact "by independently reviewing the record and the Board's findings."[12]

## IV. DISCUSSION

Although the Board considered whether First Student had an obligation to "authorize" or "preauthorize" surgery here, the Board also stated that, even if the statute did not require preauthorization, Bockus had a remedy under *Summers v. Korobkin Construction*[13] and that Bockus had availed himself of this remedy by filing his claim in September. The Board cited *Underwater Construction, Inc. v. Shirley*[14] for the proposition that the adjuster's approval of the surgery before the hearing on Bockus's written workers' compensation claim did not matter for purposes of resistance to the claim. The Board's award of attorney's fees is based on a finding that First Student resisted furnishing medical care to Bockus because of the long delay engendered by its insistence on an in-person EIME. The Commission reframed the issue before it as a question of statutory interpretation alone and did not discuss the Board's factual findings. Because we review de novo the Commission's decisions about substantial evidence,[15] we consider whether the Board's findings here are supported by substantial evidence.

Bockus argues that First Student delayed his surgery through its actions both before and after he filed his written claim, contending that First Student "had ample information" about the compensability of the third surgery before the in-person EIME. He asserts the Board's decision to award fees was proper. First Student argues that much of the delay cannot be attributed to it because it was merely exercising a statutory right

---

[12] *Humphrey*, 337 P.3d at 1178 (citing *Shehata*, 225 P.3d at 1113).

[13] 814 P.2d 1369 (Alaska 1991).

[14] 884 P.2d 156 (Alaska 1994).

[15] *Humphrey*, 337 P.3d at 1178 (citing *Shehata*, 225 P.3d at 1113).

to an EIME and it rescheduled the EIME at Bockus's request. It contends that it unqualifiedly accepted Bockus's claim because it continued to pay benefits throughout the case and ultimately accepted the compensability of the surgery. It maintains it had no duty to preauthorize care and did not resist paying for the surgery. First Student also argues that Bockus's attorney did not secure any benefit for Bockus.

We see no need in this case to determine whether an employer's statutory duty to furnish medical care[16] includes a general duty to preauthorize treatment. On the other hand, we do not suggest that the carrier's only obligation is to reimburse medical providers or injured workers for care already provided and billed or paid. In this case, as in others, a worker may be unable to get needed treatment without some assurance, implicit or otherwise, that the carrier will pay for the recommended procedure. Both parties acknowledge that an injured worker may be in a difficult position when his doctor requires assurance of payment, particularly in light of the statutory prohibition on requiring an injured worker to pay for compensable medical care.[17]

As the Board found here, First Student in fact authorized Bockus's surgery in October, "when it was required to answer [Bockus's] claim." Substantial evidence supports this finding. In mid-October LaRose told Dr. Wright's office, after the office again called for preauthorization, that "there [were] no issues with surgery being scheduled." This conversation happened at about the time First Student filed its answer. LaRose explained that providers call her "asking if the claim is open and billable and if there are any pending issues like an [E]IME"; "if there are no pending [E]IMEs or

---

[16]    AS 23.30.095(a).

[17]    AS 23.30.097(f).

-13-                                                          7137

anything . . . [the] standard issue answer [is] that there are no issues with the claim."[18] The Board could reasonably infer from this testimony that the absence of "issues" with scheduling surgery signaled to Dr. Wright that First Student would pay for it.

As demonstrated by our previous case law, an employer's acquiescence to a workers' compensation claim or provision of the requested benefit before a Board hearing does not rule out a finding that the employer resisted providing the benefit. In *Underwater Construction, Inc. v. Shirley* we affirmed the Board's award of attorney's fees under AS 23.30.145(a) when an employer delayed changing an employee's temporary total disability (TTD) benefits to permanent total disability (PTD) benefits, even though the amount of each compensation installment was the same.[19] We observed that if no amount of compensation had been at stake in the case, as the employer claimed, it would have had no reason to controvert the claim.[20] More recently, in *Harnish Group, Inc. v. Moore* we held that attorney's fees could properly be awarded under AS 23.30.145(b) when the employer had changed an employee's status to PTD at about the same time the employee filed a claim for those benefits.[21] The employer subsequently signed a reemployment plan, which was inconsistent with the status change; in its answer to the employee's claim, the employer admitted the employee was

---

[18] At oral argument before us First Student acknowledged that an adjuster may tell a surgeon about a scheduled EIME to communicate the possibility of a denial of coverage if the EIME says the surgery is not reasonable or necessary or related to the claim.

[19] 884 P.2d at 158-59.

[20] *Id.* at 159.

[21] 160 P.3d 146, 150, 152-53 (Alaska 2007).

PTD but denied it should pay attorney's fees.[22]  We held that fees could be awarded for resisting payment because of the employer's action in signing the reemployment plan.[23]

In considering the contours of First Student's obligation to furnish medical care under AS 23.30.095(a), the Commission reasoned that AS 23.30.097(d), the statutory provision requiring payment of medical bills within 30 days, was more specific and thus controlled over AS 23.30.095(a).  To the extent the Commission's decision can be read as interpreting "furnish" in AS 23.30.095(a) to mean *solely* a duty to pay bills in accordance with AS 23.30.097(d), we disagree with that analysis.[24]  But the Board's decision that First Student resisted furnishing the third surgery was not based solely on a legal duty to preauthorize care.  As the Board observed, First Student had the option of "accurately portraying the uncontroverted status of an injured worker with a compensable injury to the employee's selected provider to facilitate treatment."  And while First Student argues that authorizing surgery before an EIME would interfere with its investigation of the claim, the questions the adjuster asked Dr. Williams in both the July records review and the in-person EIME were not directed at an opinion about the

---

[22]     *Id.* at 148-50.

[23]     *Id.* at 153-54.

[24]     The Commission's analysis  failed to explain why AS 23.30.095(a) and .097(d) could not be harmonized.  *See In re Hutchinson's Estate*, 577 P.2d 1074, 1075 (Alaska 1978) (discussing statutory interpretation principles, including principle that "where one section deals with a subject in general terms and another deals with a part of the same subject in a more detailed way, the two should be harmonized, if possible").  In our view, the subsections can be harmonized because the employer's obligation in AS 23.30.095(a) to furnish medical care can include an obligation to pay medical bills promptly as set out in AS 23.30.097(d).  At oral argument before us, First Student agreed that an employer's obligation to furnish medical care is broader and includes at a minimum an obligation to review medical records to determine what treatment is necessary.

surgery itself. Instead, the adjuster listed nine treatment options and asked for an opinion about the reasonable necessity of all of the treatments. This broad request was unreasonable because Bockus and his doctor, after trying a course of conservative care, had already decided that surgical treatment was the best option for addressing his disc herniation and continuing pain.

Because Bockus sought surgery within a few months of the work-related injury, First Student's ability to shape a course of treatment was more limited. We faced a similar issue more than 15 years ago in *Phillip Weidner & Associates v. Hibdon*.[25] There, as here, the employee's doctor recommended surgery after conservative care failed to improve the employee's pain, but the doctor would not schedule the surgery absent authorization from the compensation carrier.[26] We observed that even though the employer's medical experts did not recommend surgery, they could not dispute that it was "within the realm of medically accepted options."[27] Consistent with the temporal division set out in AS 23.30.095(a), we distinguished the Board's supervision of medical care in the two years immediately following the injury from care subsequent to those two years, noting that in the first two years after an "undisputedly work-related" injury, the Board's review is "limited to whether the treatment sought is reasonable and necessary."[28] Following that two-year period, the Board "has some latitude to choose among reasonable alternatives" in treatment.[29] As we said in *Hibdon*, "Choices between

---

[25]    989 P.2d 727 (Alaska 1999).

[26]    *Id.* at 729-30.

[27]    *Id.* at 732.

[28]    *Id.* at 731.

[29]    *Id.*

reasonable medical options and the risks entailed should be left to the patient and his or her physician."[30] An employer's doctor's opinion about the best course of treatment may differ from that of the employee's treating physician, but the principle in *Hibdon* still applies.

Further surgery was on the list of treatment options sent to Dr. Williams, so presumably it was undisputedly "within the realm of medically accepted options" to treat Bockus's condition. In his July records review, the only preexisting condition Dr. Williams identified was "[m]ild, chronic loss of vertebral body height" at levels of the thoracic spine higher than the location of the earlier surgeries. Dr. Williams referred to the June MRI, which showed disc material and cord impingement, at the time of the records review in July. First Student asked Dr. Williams in July if he could "identify an alternate explanation" that would exclude the work-related accident as the substantial cause of Bockus's medical complaints; Dr. Williams responded that he was "unaware of an alternate explanation." All of this information supports Bockus's contention that First Student had adequate information about the reasonable necessity of the third surgery well before the surgery was authorized in October. And the information First Student sought from the EIME physician was not reasonably related to the narrow question of the compensability of and need for the requested surgery.

Accurate communication to the provider's office about the purpose of the EIME might also have assisted in clarifying the likelihood of payment. Nashlund agreed that had First Student authorized the surgery in July, she would have scheduled it regardless of the pending EIME. Here, the EIME sought general information about the best course of treatment for Bockus; the questions in the July EIME did not communicate to Dr. Williams that Dr. Wright was recommending a third surgery or that Bockus and

---

[30] *Id.* at 733.

his treating physician had decided to pursue that course of treatment. We recognize that an employer has a right "at reasonable times" to require an employee to attend an examination by the employer's physician,[31] but when an EIME delays care, as it did here, the information sought should be reasonably related to treatment the employer is delaying.

Substantial evidence supports the Board's finding that the employer resisted furnishing medical care to Bockus by unreasonably delaying the third surgery. As the Board correctly observed, First Student "could have pursued its investigation according to the methods and timelines afforded it under the Act while simultaneously facilitating the quick and efficient delivery of medical benefits to [Bockus]." Its failure to do so led Bockus to file a written claim for medical benefits in September, prior to both the in-person EIME and the adjuster's approval of the surgery. In addition to the delay before the September EIME, First Student delayed communicating the September EIME results to Dr. Wright's office for almost three weeks, and did so only after Dr. Wright's office contacted the adjuster to inquire why a written preauthorization form had not been returned. First Student sent supplemental questions to Dr. Williams about Bockus's possible course of recovery from a surgery that had not yet happened and got a response from him before the adjuster told Dr. Wright's office there were no longer any "issues" with scheduling the surgery.[32] There is more than enough evidence to support the Board's finding that First Student's actions delayed Bockus's compensable surgery.

---

[31]     AS 23.30.095(e).

[32]     First Student also contends that Bockus's attorney did not secure any benefit for him. Substantial evidence supports the Board's finding that counsel obtained the surgery as a result of filing the claim. As the Board said, the written claim, by requiring an answer, forced First Student to authorize the surgery. *See Harnish Group, Inc. v. Moore*, 160 P.3d 146, 153-54 (Alaska 2007) (affirming attorney's fees award when claim forced employer to decide whether to admit claim).

## V.    CONCLUSION

We REVERSE the Commission's decision and REMAND to the Commission with instructions to reinstate the Board's award.